IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    5:25-CR-00302 |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ZIAIR DUNLAP,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT AND FOR OTHER RELIEF

Dated: July 10, 2026

Respectfully submitted,

*/s/ Matthew J. McCrobie*
Matthew J. McCrobie
Assistant United States Attorney
Bar Roll No. 702739

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 1

I.   Legal Landscape ...................................................................................................... 1

II.  Relevant Factual Chronology ................................................................................. 3

ARGUMENT ..................................................................................................................... 5

I.   Dunlap Waived the Argument that He Is Entitled to Relief Based on Mr. Sarcone's

Alleged Lack of Authority. ..................................................................................... 5

II.  Mr. Sarcone Was Validly Exercising Authority over the United States Attorney's Office

When the Grand Jury Indicted Dunlap and the Office Denied His Admission to PATH. ......... 7

A.   Under the FVRA, Mr. Sarcone Was Validly Serving as Acting U.S. Attorney Because

the Office of U.S. Attorney Was Vacant and He Was the First Assistant to That Office. ..... 7

B.   Mr. Sarcone was Authorized as Special Attorney and FAUSA to Conduct and

Supervise Proceedings in the NDNY ................................................................... 17

III. Dunlap's Indictment Should Not Be Dismissed Because It Was Lawfully Obtained by

Duly Authorized AUSAs. ..................................................................................... 23

IV.  There Is No Basis or Authority for the Court to Invalidate the Office's Decision to

Deny Dunlap's Request to Participate in PATH ................................................... 27

V.   Dunlap Is Not Entitled to Discovery on His Claims ............................................ 28

CONCLUSION ................................................................................................................. 30

**INTRODUCTION**

A federal grand jury in the Northern District of New York ("NDNY") indicted Ziair Dunlap for distributing substantial amounts of methamphetamine on three separate occasions. Dunlap subsequently asked the U.S. Attorney's Office ("the Office") to allow him to resolve his charges through a pretrial diversion program. The Office, led by First Assistant U.S. Attorney John A. Sarcone III, denied the request. Months later, Dunlap's attorneys appealed directly to Mr. Sarcone, asking him to approve Dunlap's admission to the program in his capacity as First Assistant. When that effort proved unsuccessful, Dunlap adopted the position that Mr. Sarcone lacked authority to consider his diversion request in the first place and now moves to dismiss the indictment on that basis. Dunlap waived his challenge to Mr. Sarcone's authority and, in any event, his motion lacks merit and should be denied.

**BACKGROUND**

I.      **Legal Landscape**

When a U.S. Attorney resigns or otherwise vacates his office, Congress has provided three methods for allowing someone to perform the duties of that office on a temporary basis until a new Senate-confirmed U.S. Attorney takes office, thus ensuring the uninterrupted functioning of the U.S. Attorney's Office. Each of those methods has specific rules, benefits, and drawbacks. It is typically up to the President, or principal officers acting on the President's behalf, to decide which method is best suited to the circumstances, and those methods generally supplement, rather than displace, each other.

First, in 28 U.S.C. §546, Congress authorized the Attorney General to "appoint a United States attorney for the district in which the office of United States attorney is vacant" to serve on an interim basis for 120 days or until a Senate-confirmed U.S. Attorney takes office. *Id.* §§546(a),

1

546(c). If an interim appointment expires, and the vacancy has not otherwise been filled, the district court may appoint an interim U.S. Attorney. *Id.* §546(d).

The second method for temporarily assigning the duties of a vacant office is found in the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. §§3345-3349e, which applies to a variety of vacancies across the Executive Branch. In the FVRA, Congress authorized certain individuals to temporarily perform the duties of a vacant office "in an acting capacity," 5 U.S.C. §3345(a)(1), subject to specified time limitations, *id.* §3346. Unless the President designates a Senate-confirmed officer or a senior agency employee to serve in that role, *id.* §§3345(a)(2)-(3), the default rule is that the "first assistant" to the vacant office serves as the "acting officer," *id.* §3345(a)(1).

The FVRA is the "exclusive means" for authorizing an "acting official" to temporarily perform the duties of a vacant office, "unless" Congress has expressly provided otherwise or the President makes a recess appointment. 5 U.S.C. §3347(a). Where Congress has enacted an agency-specific statute that provides a means for acting service, both that statute and the FVRA are available. *Id.*; *see also, e.g., United States v. Smith*, 962 F.3d 755, 763 n.1 (4th Cir. 2020) (citing *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 555-56 (9th Cir. 2016)).

The third means that Congress has provided for temporary continuity in the office of U.S. Attorney involves the delegation of power by the Attorney General. Congress has authorized the Attorney General to delegate authority, including the non-exclusive duties of a U.S. Attorney, to other Department officers and employees. The Attorney General is the "head of the Department of Justice," 28 U.S.C. §503, and is vested with "[a]ll functions" of the Department's officers, agencies, and employees, subject to narrow exceptions not relevant here, *id.* §509. That includes the U.S. Attorneys' functions to conduct litigation in their districts. Indeed, §515(a) specifies that

the Attorney General may "conduct any kind of legal proceeding, civil or criminal, . . . which United States attorneys are authorized by law to conduct." Congress also independently vested the Attorney General with plenary authority to conduct and supervise litigation on behalf of the United States. *See id.* §§516-519.

The Attorney General has unquestioned authority to appoint various attorneys within the Department and to delegate his functions to those attorneys. Congress has specifically empowered the Attorney General to appoint other attorneys to carry out the Department's functions, including special attorneys and special assistants to the Attorney General, *id.* §515(a), (b), Assistant U.S. Attorneys, *id.* §542(a), special attorneys to assist U.S. Attorneys, *id.* §543, and other "officials" to "detect and prosecute crimes against the United States," *id.* §533(1). And the Attorney General may delegate "any function of the Attorney General" to "any other officer, employee, or agency of the Department of Justice," *id.* §510, and may direct any Department officer "or any attorney specially appointed by the Attorney General under law" to "conduct any kind of legal proceeding, civil or criminal, ... which United States attorneys are authorized by law to conduct," *id.* §515(a); *see also id.* §518(b).

## II.    Relevant Factual Chronology

1. On February 17, 2025, Carla B. Freedman, the U.S. Attorney for the NDNY appointed by President Biden and confirmed by the Senate, left office. *See* https://perma.cc/3FSP-TTM5. By operation of the default provision of the FVRA, 5 U.S.C. §3345(a)(1), Daniel Hanlon, who was then FAUSA for the district, became Acting U.S. Attorney. On February 28, 2025, the Attorney General appointed Mr. Sarcone as U.S. Attorney pursuant to 28 U.S.C. §546, effective March 17, 2025. Under that statute, Mr. Sarcone was authorized to serve as U.S. Attorney on an interim basis for 120 days. *See* 28 U.S.C. §546(c)(2).[1]

2. On July 14, 2025, the last day of Mr. Sarcone's interim term, the Board of Judges for the NDNY declined to exercise its authority under 28 U.S.C. §546(d) to appoint a U.S. Attorney for the district. *See* https://perma.cc/XP4Z-WB8F. That same day, Daniel Hanlon was

---

[1] This Court recited these facts in *In re Grand Jury Subpoenas to Office of N.Y. State Attorney General*, 814 F. Supp. 3d 284, 288-89 (N.D.N.Y. Jan. 8, 2026).

reassigned to Deputy U.S. Attorney, rendering the FAUSA role vacant. Mr. Sarcone was appointed as a special attorney under authority including 28 U.S.C. §§509, 510, and 515, and designated as the FAUSA, effective July 15, 2025.[2]

3. Accordingly, the Executive Office for United States Attorneys (EOUSA) issued a letter appointing Mr. Sarcone as special attorney and authorizing him "to conduct in the Northern District of New York, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings and proceedings before United States Magistrates, which United States Attorneys are authorized to conduct." The letter states that Mr. Sarcone's appointment as special attorney "is indefinite." Likewise, the General Counsel for EOUSA approved a written request to appoint Mr. Sarcone as FAUSA for a period of one year. Mr. Sarcone's designation as FAUSA was effective July 15, 2025.[3] By operation of the default provision of the FVRA, Mr. Sarcone began serving as Acting U.S. Attorney on July 15, 2025. *See* 5 U.S.C. §3345(a).

4. On July 24, 2025, a NDNY grand jury returned an indictment charging Dunlap with distribution of methamphetamine, in violation of 21 U.S.C. §841(a)(1) and (b)(1)(A). Dkt. 1. In addition to the grand jury foreperson, the indictment was signed by AUSA Nicolas Commandeur for AUSA Matthew J. McCrobie. *Id.* at 3. Mr. Sarcone's name and title as Acting United States Attorney appeared on the signature block, but he did not sign the indictment. *Id.* The case was assigned to United States District Judge Glenn T. Suddaby.

5. On July 30, 2025, Assistant Federal Public Defender (AFPD) Anne LaFex was appointed as counsel for Dunlap. On December 5, 2025, AFPD LaFex requested that the Office consider Dunlap for participation in the district's PATH program.[4]

6. On January 8, 2026, this Court, sitting by designation, determined in a separate case that Mr. Sarcone was not properly appointed as Acting United States Attorney under the automatic-succession provision of the FVRA and that the Attorney General could not exercise her general delegation authority to vest in Mr. Sarcone the authority of a U.S. Attorney. *In re Grand Jury Subpoenas*, 814 F. Supp. 3d at 292-98.

---

[2] On October 8, 2025, the Attorney General confirmed that Mr. Sarcone's appointment as special attorney and designation as FAUSA was done at her direction and under her general delegation authority. *In re Grand Jury Subpoenas*, 814 F. Supp. 3d at 289.

[3] *In re Grand Jury Subpoenas*, 814 F. Supp. 3d at 289.

[4] Providing Alternatives That Help (PATH) is a pretrial diversion program that was created in 2024 as a collaborative effort between the U.S. Attorney's Office, the U.S. Probation Office, and the court. Like other pretrial diversion programs, it provides prosecutors with another tool—in addition to the traditional criminal justice process—to ensure accountability for criminal conduct, protect the public by reducing rates of recidivism, conserve prosecutive and judicial resources, and provides opportunities for treatment, rehabilitation, and community correction. Defendants who are admitted into PATH and successfully complete the program can achieve either dismissal of their charges or a non-incarceration sentence.

7. On February 9, 2026, the defendant was advised that the Office rejected his request to participate in PATH.

8. On February 10, 2026, Mr. Sarcone's tenure as Acting U.S. Attorney expired under 5 U.S.C. §3346(a)(1). On February 11, 2026, the Board of Judges for the NDNY appointed attorney Donald Kinsella as U.S. Attorney pursuant to 28 U.S.C. §546(d). *See* https://perma.cc/N7CU-2ZWC. The next day, the President terminated Mr. Kinsella's position as U.S. Attorney. Mr. Sarcone continues to serve as FAUSA for the district. *See* https://perma.cc/Z6AV-D629.

9. On March 26, 2026, AFPD LaFex sought reconsideration of Dunlap's PATH request. On or about March 30, 2026, defense counsel advised that Federal Public Defender Eric Schillinger intended to ask Mr. Sarcone to reconsider the denial of Dunlap's participation in PATH.

10. On May 18, 2026, AUSA McCrobie advised AFPD LaFex that the Office had not changed its decision on Dunlap's PATH request. AFPD LaFex responded the following day in an email indicating that she would not accept that representation and insisting that the decision needed to be communicated by FAUSA Sarcone. Ms. LaFex wrote that "[s]ince there's an outstanding request from [Federal Public Defender] Eric [Schillinger] to [FAUSA] John [Sarcone] to reconsider diversion for Mr. Dunlap, we will wait for John's response."

11. On May 22, 2026, AFPD LaFex acknowledged in a filed letter that the Office denied Dunlap's PATH request. Dkt. 36.

## ARGUMENT

The Court should deny Dunlap's motion to dismiss the indictment. Even if the Attorney General's appointment of Mr. Sarcone as a special attorney and his designation as FAUSA for the NDNY was invalid—a proposition that the government contests—Dunlap was not prejudiced because his indictment was signed by an Assistant U.S. Attorney. Moreover, the Office's consideration of Dunlap's PATH application while Mr. Sarcone was the designated FAUSA does not require dismissal of the indictment.

**I.    Dunlap Waived the Argument that He Is Entitled to Relief Based on Mr. Sarcone's Alleged Lack of Authority.**

As an initial matter, Dunlap has waived his claim that Mr. Sarcone lacked legal authority to supervise the Office during the period when Dunlap's indictment was presented and returned, and when he was denied admission to the PATH program. The facts pertaining to Mr. Sarcone's role in the Office have not changed since July 15, 2025—when he assumed the position of Acting

5

U.S. Attorney. Those facts were publicly available, including on the Court's own website,[5] and Dunlap knew or should have known those facts at the time that he submitted his initial request for the Office to admit him into PATH, and again when he requested FAUSA Sarcone to reconsider the denial of his admission into PATH.

"[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation modified). "A finding of true waiver applies . . . when . . . defendants not only failed to object to what they now describe as error, but they actively solicited it, in order to procure a perceived . . . benefit." *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007). That's exactly what occurred here.

Dunlap did not complain when his PATH request was denied on February 9, 2026. Instead, Dunlap sat silently as each successive motions deadline in his case came and went, choosing instead to seek stipulations to exclude time. *See* dkt. 12 (motions to be filed by 9/2/2025); dkt. 20 (motions to be filed by 10/17/2025); dkt. 22 (motions to be filed by 12/5/2025); dkt. 24 (motions to be filed by 2/17/2026). Dunlap went so far as to ask the Court for a change-of-plea hearing. Text Notice (Mar. 16, 2026). As the scheduled plea hearing approached, FPD Schillinger personally and specifically requested that FAUSA Sarcone reconsider Dunlap for PATH. By requesting to be considered for the PATH program under these circumstances, the defendant accepted the decision-making authority of FAUSA Sarcone and others in leadership positions in the Office. He should not be permitted to challenge Mr. Sarcone's authority and role in the PATH process only when his effort to invoke that authority in his favor proved unsuccessful.

---

[5] https://www.nynd.uscourts.gov/news/inquiries-regarding-designation-john-sarcone-be-acting-us-attorney-ndny (July 24, 2025).

II.     **Mr. Sarcone Was Validly Exercising Authority over the Office When the Grand Jury Indicted Dunlap and the Office Denied His Admission to PATH.[6]**

A.     **Under the FVRA, Mr. Sarcone Was Validly Serving as Acting U.S. Attorney Because the Office of U.S. Attorney Was Vacant and He Was the First Assistant to That Office.**

It is undisputed that the U.S. Attorney for the NDNY is an office requiring appointment by the President and confirmation by the Senate (a "PAS" office), is subject to the FVRA, *see* 28 U.S.C. §541(a); 5 U.S.C. §§101, 105, and this office is vacant. The last Senate-confirmed U.S. Attorney, Carla Freedman, left office on February 17, 2025. The Attorney General appointed Mr. Sarcone as interim U.S. Attorney, pursuant to 28 U.S.C. §546, effective March 17, 2025. On the day that his 120-day term as interim U.S. Attorney expired, the Attorney General appointed Mr. Sarcone as special attorney under authority including 28 U.S.C. §§509, 510, and 515, and designated Mr. Sarcone as the FAUSA, effective July 15, 2025, consistent with 28 C.F.R. §0.137(b).

Mr. Sarcone thus was serving as FAUSA when his term as interim U.S. Attorney ended. Under the default provision of the FVRA, 5 U.S.C. §3345(a), Mr. Sarcone began performing "the functions and duties of the office" of U.S. Attorney "in an acting capacity" the same day, subject to the time limits of the FVRA, *id.* §3346(a)(1). Thus Mr. Sarcone was serving in three capacities when the indictment in this case was returned on July 24, 2025: as Acting U.S. Attorney, as FAUSA, and as a Special Attorney. Once his term as Acting U.S. Attorney expired on February

---

[6] The government recognizes that this Court previously concluded that Mr. Sarcone was not validly serving as Acting U.S. Attorney in *In re Grand Jury Subpoenas*, 814 F. Supp. 3d at 297. As the Court knows, the government has appealed that decision. 2d Cir. Case No. 26-156. That case was heard by a panel of the Second Circuit on May 4, 2026, and is awaiting decision. The government respectfully reasserts its arguments in defense of Mr. Sarcone's authority here, and develops them further, in the hopes that the Court will reconsider its earlier decision, and to preserve these arguments for appellate review. *See, e.g.*, *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (noting that a district court decision is not binding precedent, even on the same judge in a different case).

10, 2026, Mr. Sarcone was still serving as FAUSA and as a Special Attorney. Mr. Sarcone's service in these capacities was valid under the FVRA.

The FVRA does not require a first assistant to be the incumbent at the time the vacancy initially arose to serve as an acting officer under the default provision in §3345(a)(1). First, consider the statutory text. The FVRA does not say that only the first assistant *at the time the vacancy arose* shall be the default acting officer under §3345(a)(1). Rather, it says that "[i]f" a PAS officer "dies, resigns, or *is* otherwise unable to perform the functions and duties of the office," "the first assistant *to the office* of such officer shall perform" those functions and duties in an acting capacity. 5 U.S.C. §3345(a)(1) (emphasis added). Because a vacancy is "a continuing state," *NLRB v. Noel Canning*, 573 U.S. 513, 539 (2014), §3345(a)(1) requires determining who the first assistant is when a PAS officer "is" unable to perform the functions and duties of the office, not just when a PAS officer first became unable to perform, *see Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (when a statutory provision is "expressed in the present tense," it requires consideration of the status at the time of the covered action, not before); *Nichols v. United States*, 578 U.S. 104, 109-10 (2016) (same). That is confirmed by the statute's reference to the first assistant "to *the office* of such officer" (which can be different people over time, rather than the first assistant to a particular PAS officeholder at a particular time).

"The Dictionary Act also ascribes significance to verb tense." *Carr v. United States*, 560 U.S. 438, 448 (2010). It provides that, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[,] . . . words used in the present tense include the future as well as the present." 1 U.S.C. §1; *see, e.g.*, *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 126 (2d Cir. 2008) (explaining that under Dictionary Act statutory reference to land "which *is* held in trust" includes "land that *will be* held in trust"). This further supports the

interpretation of §3345(a)(1) as applying not only at the moment that a vacancy begins, but also at any future point during that vacancy.

Although the Third Circuit in *United States v. Giraud*, 160 F.4th 390, 398 (3d Cir. 2025), rejected this argument, it did so based on a misapplication of Supreme Court precedent. Citing *Fischer v. United States*, 603 U.S. 480, 489-90 (2024), the *Giraud* court concluded that the phrase "is otherwise unable to perform the functions and duties of the office" is "limited by the list of specific examples that precede it." *Id*. Because "dies" and "resigns" refer to a single moment in time, the Third Circuit reasoned that the "otherwise unable to perform" clause "must be read to refer to a single instance." *Id*. But neither *Fischer,* nor the principles of statutory interpretation upon which it is based, support this reading. To interpret the phrase "is otherwise unable" as referring to a continuing state does not "rende[r] meaningless" the other terms that accompany this phrase or make those terms "redundant"—the key factors that support reading an "otherwise" clause narrowly. *Fischer*, 603 U.S. at 487, 488. Accordingly, there is no reason not to give the phrase "is otherwise unable" its plain meaning as referring to an ongoing state.

Second, consider §3345's structure. Elsewhere in the same section, Congress *did* include backward-looking language that makes eligibility for acting service for certain individuals depend on the state of affairs during the time preceding the vacancy. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation marks omitted).

Two paragraphs later, for instance, Congress made ineligible for a presidential acting designation certain officials who had not served in the agency for at least 90 days in the year preceding when the vacancy arose. *See* 5 U.S.C. §3345(a)(3)(A). In the next subsection, Congress

9

lifted the general prohibition on having an acting official also be the nominee for anyone who had served as first assistant for at least 90 days prior to the date on which the vacancy initially arose. *See id*. §3345(b)(1)(A). No such backward-looking eligibility requirement, however, applies to an official who is designated first assistant under §3345(a)(1) and is not the nominee for the position in question. To the contrary, the general prohibition in §3345(b)(1)(A) implicitly contemplates that a first assistant may serve as an acting official even if she "did not serve in the position of first assistant" prior to the vacancy, so long as she is not also the nominee. *Id*.

Third, although text and structure alone should resolve the question, consider also statutory history, which "reinforces that textual analysis." *Snyder v. United States*, 603 U.S. 1, 12 (2024). Prior to the FVRA, the Vacancies Act had provided that if the PAS officer died, resigned or was sick or absent, "his first assistant" presumptively would "perform the duties of the office until a successor is appointed or the absence or sickness stops." 5 U.S.C. §§3345, 3346 (1997). Thus, the default candidate for temporarily filling a vacancy was the first assistant *of the officer* whose death, resignation, sickness or absence made the office vacant. But in 1998, Congress chose different language. The version of the FVRA that became law abandoned the "his first assistant" language. Instead, Congress used "the first assistant to the office of such officer" to define the presumptive default for acting service in all PAS offices. 5 U.S.C §3345(a)(1). This change in language must be given meaning, rather than ignored. When Congress substantively revises a statute's text, courts presume Congress "intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). "[A] significant change in language is presumed to entail a change in meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 256-60 (2012). Here, as discussed above, the change in statutory language reinforces that

§3345(a)(1) is not triggered by the death, departure, or incapacity of a particular PAS officeholder, but by a vacancy in the office, and thus applies to anyone who is first assistant during that vacancy.

The legislative history of the FVRA confirms this understanding of §3345(a)(1). An earlier version of the bill defined the first assistant in §3345(a)(1) as the "first assistant of *such officer*," S. Rep. No. 105-250 at 25 (1998) (emphasis added), rather than the "first assistant *to the office* of such officer," 5 U.S.C. §3345(a)(1) (emphasis added). That proposed language was the subject of debate and a cloture vote and was eventually altered in the final version of the bill after the cloture motion failed. See 144 Cong. Rec. S10868-69 (daily ed. Sept. 24, 1998); 144 Cong. Rec. S11022 (daily ed. Sept. 28, 1998) (statement of Sen. Thompson) (explaining that under the bill being debated "the first assistant to the officer becomes the acting officer"). Some Senators voted against cloture precisely because the "first assistant to such officer" proposed language was too restrictive, and Congress as a result changed the language to the "first assistant to the office of such officer" to address those concerns. For example, Senator Lieberman worried that "by the terms of the bill, a first assistant apparently can take over only if he or she was the first assistant at the time of the vacancy." 144 Cong. Rec. S11037 (daily ed. Sept. 28, 1998). Senator Lieberman continued:

> Also troubling is what can happen when a new President comes into office. If individuals in Senate-confirmed positions leave before the new President takes office, as often happens, then the only people who would be qualified to serve as acting officials as the new administration gets off the ground, because they were the first assistants at the time of the vacancy, are holdovers, often political appointees from the previous administration. That could create an awkward situation that would require a new administration to staff itself with a previous administration's political appointees.

*Id*. at S11038.

In response, Senator Thompson assured the Senate that "just to be the acting officer, anyone who serves in that position would become the acting officer without having been there any length of time." *Id*. But those assurances were not enough, and the cloture motion failed. *Id*. at

S11039. To secure passage of the bill, as Senator Thompson later explained, "subsequent changes" were made, including using "[t]he term 'first assistant to the office' . . . rather than 'first assistant to the officer.'" 144 Cong. Rec. S12822 (daily ed. Oct. 21, 1998). "This change [was] made to 'depersonalize' the first assistant." *Id*. That critical change in the language—which was made after specific concerns that the earlier phrasing was too narrow and restricted acting service to incumbent first assistants—underscores what §3345(a)(1)'s text and structure already demonstrate: that the first assistant is not required to be serving in that role at the moment the vacancy in the PAS office arises.

Congress knows how to limit acting officer status to only incumbent first assistants when it wants to. Take, for example, Congress's 2022 amendment to the statute governing appointment of inspectors general, 5 U.S.C. §403(h), *available at* https://perma.cc/7PPH-8BC6.[7] Similar to the FVRA, §403(h) provides that when an inspector general "dies, resigns, or is otherwise unable to perform the functions and duties of that position," *id.* §403(h)(2), the "first assistant to the position of Inspector General shall perform the functions and duties of the Inspector General temporarily in an acting capacity," *id*. §403(h)(2)(B). Crucially, Congress specified that the term "first assistant" in this subsection means only the person who was first assistant "as of the day before the date on which the Inspector General dies, resigns, or otherwise becomes unable to perform the functions and duties of the position."[8] *Id*. §403(h)(1)(A)(i). The absence of such restrictive language in the FVRA highlights that §3345(a)(1) is not limited to incumbent first assistants.

---

[7] *See* Pub. L. 117-286, sec. 5(b) (Dec. 27, 2022) (confirming that amendments to the Inspector General Act enacted after Oct. 19, 2021, are in effect even though such amendments were not included in the Act's codification).

[8] Here, Congress uses "*becomes* unable to perform," not "*is* unable to perform," to limit the term "first assistant" to the person serving in that position at the moment the vacancy first occurs.

Finally, consider longstanding Executive Branch practice. During presidential transitions, past administrations have routinely filled PAS positions that become vacant *before* noon on Inauguration Day by appointing new first assistants *at or after noon* on Inauguration Day. Those first assistants, by automatic operation of §3345(a)(1), then serve in an acting capacity, subject to the FVRA's time constraints. There are myriad examples of this practice since the enactment of the FVRA,[9] including Noel Francisco as Acting Solicitor General at the beginning of the previous Trump administration, Brian Boynton's service as Acting Assistant Attorney General for the Civil Division at the beginning of the Biden administration, and David Barron's service as the Acting Assistant Attorney General for the Office of Legal Counsel at the beginning of the Obama administration. *See* Reply Brief by United States, *In re Grand Jury Subpoenas*, 2d Cir. Case No. 26-156, Dkt. 86, at 14-16 n.3 (listing 31 examples *from Main Justice alone* spanning the past four administrations). Interpreting the FVRA to preclude this practice would hobble the Executive Branch during transitions between Presidential administrations—a time when most PAS officials and many of their first assistants have all resigned *before* the transition, and when the new Administration needs to temporarily fill those vacancies with individuals who personally support its policies, rather than holdover career officials.

The Government Accountability Office (GAO)—a component of the Legislative Branch statutorily charged with monitoring FVRA compliance, *see* 5 U.S.C. §3349(b)—agrees with that

---

5 U.S.C. §403(h)(1)(A)(i) (emphasis added). This further shows that the use of "is" in §3345(a)(1) denotes a constant state or condition, rather than a particular moment of transition.

[9] The lack of *pre*-FVRA examples of post-vacancy first assistants serving in an acting capacity reflects that prior statutes contained express language authorizing only incumbent first assistants to serve as acting officials. *See* 5 U.S.C. §§3345 (1997) (referring to the PAS officer and "his first assistant"). The emergence of a post-enactment practice of appointing non-incumbent first assistants to serve in an acting capacity confirms that the FVRA made a significant change to the law by eliminating the previous incumbency requirement.

longstanding practice.[10] So does the Department of Justice's Office of Legal Counsel (OLC).[11] All of this shows that someone whom the Attorney General designates as FAUSA after the prior U.S. Attorney steps down can serve under the FVRA as the Acting U.S. Attorney for the specified time period during the vacancy in that PAS office.

Respectfully, this Court should reconsider its interpretation of the FVRA in *In Re Grand Jury Proceedings*, 814 F. Supp. 3d at 295-97. First, this Court stressed that §3345(a)(1), unlike §3345(a)(2) and (a)(3), is automatic: the first assistant becomes the acting officer without any need for further action by the President or anyone else. 814 F. Supp. 3d at 295. But the automatic nature of the provision does not suggest that it operates only on first assistants in place "at the moment a vacancy first arises." *Id*. On the contrary, because a vacancy is a continuing state of affairs, the automatic nature of §3345(a)(1)'s default rule and its use of the present tense establish that whoever is serving as the first assistant at a particular moment in time during the vacancy becomes the acting official. If only the first assistant who was in office when the vacancy first arose could serve, then §3345(a)(1) could not automatically apply once that first assistant left office. Section 3345(a)(1) is an automatic default rule—it applies to first assistants precisely because an agency head can often ensure that there is a first assistant in place and the President therefore does not have to personally fill every PAS vacancy that arises. The rule makes sense, given the approximately 1,000 PAS offices in the Executive Branch.[12]

---

[10] *See* Letter from Victor S. Rezendes, Managing Director, Strategic Issues, GAO to U.S. Senators Joseph Lieberman and Dan Burton (Dec. 7, 2001), *available at* https://www.gao.gov/assets/gao-02-272r.pdf.

[11] *See Designation of Acting Associate Attorney General*, 25 Op. O.L.C. 177, 179-81 (2001) ("2001 OLC Opinion"), *available at* https://www.justice.gov/file/146056/dl.

[12] *See* Center for Presidential Transition, *Presidential Transition Guide* (2023), 93*, available at* https://perma.cc/P25H-4FR6 (reflecting data from 2016).

Next, the Court concluded that allowing new first assistants to become acting officials under §3345(a)(1) would render subsections (a)(2) and (a)(3) "superfluous." *Id*. This is wrong. There are at least three significant circumstances where the President cannot rely on subsection (a)(1) to select an acting officer and thus subsections (a)(2) and (a)(3) continue to play an important role. First, when the first assistant position is itself a PAS office,[13] (a)(1) is unavailable because the Executive Branch cannot appoint a first assistant without Senate confirmation. Instead, the President must use (a)(2) or (a)(3). Second, (a)(1) is also not available when the office of an agency head is vacant and the first assistant must be appointed by the agency head. *See, e.g.*, 12 U.S.C. §5491(b)(5) (Bureau of Consumer Financial Protection); 44 U.S.C. §2103(c) (National Archives and Records Administration). Third, subsections (a)(2) and (a)(3) also play a distinct role when the President wants to leave the current first assistant in place and appoint someone else to be the acting officer—*e.g.*, because the individual serving as first assistant is the best suited to perform the important second-in-command functions of a first assistant. *See, e.g.*, *Designating an Acting Attorney General*, 42 Op. O.L.C. 182 (2018) (discussing the designation of Matthew Whitaker as Acting Attorney General under §3345(a)(3)).

The government's interpretation of the FVRA does not leave presidential designations under (a)(2) or (a)(3) only for "unusual circumstances." 814 F. Supp. 3d at 295 (internal quotation marks omitted). Such presidential designations are not rare. On the first day of the present administration alone, rather than relying on §3345(a)(1), the President designated 31 officials to serve in an acting capacity, at least 27 of whom he designated under (a)(2) and (a)(3) of the FVRA.

---

[13] This is often the case for the highest positions in agencies. For example, the Deputy Attorney General is a PAS office, *see* 28 U.S.C. § 504, as is the Deputy Secretary of State, *see* 22 U.S.C. § 2651a(a)(2).

15

*See* https://perma.cc/79PA-GJFQ.[14] More broadly, Presidents have issued standing orders of succession for agencies pursuant to their authority under (a)(2) and (a)(3).[15] And many proposed Presidential default designations under §3345(a)(2) and (a)(3) have occasioned formal opinions issued by the Office of Legal Counsel.[16]

This Court also dismissed the fact that §3345(a)(3) and (b)(1) have backward-looking eligibility requirements, whereas §3345(a)(1) does not. The Court reasoned that (a)(1) is a "self-executing default that applies when the vacancy arises, so it does not include the screening requirements that Congress used to cabin discretionary selections under sections 3345(a)(2), (a)(3) and (b)(1)(A)." 814 F. Supp. 3d at 296. But the court did not explain why, in its view, the automatic nature of §3345(a)(1) justified the lack of similar language expressly focusing on whether the first assistant held office at the time the vacancy arose. If Congress did not wish to allow recently appointed first assistants to serve as acting officers, it could have limited §3345(a)(1) similarly as it did (a)(3), or as it later did in 5 U.S.C. §403(h). Congress did not do so; indeed, as explained

---

[14] Based on a review of the statutory authority underlying those designations, only four of them could have been based on a statute other than the FVRA. *See* 38 U.S.C. §304 (Acting VA Secretary); 31 U.S.C. §502(f) (Acting OMB Director); 40 U.S.C. §302(b) (Acting GSA Administrator); 42 U.S.C. §902(b)(4) (Acting SSA Commissioner).

[15] *See e.g.*, Executive Order 13963 of December 10, 2020 (Department of Defense); Executive Order 13915 of April 14, 2020 (Department of the Interior); Executive Order 13251 of December 28, 2001 (Department of State); *see also Designating an Acting Director of National Intelligence*, 43 Op. O.L.C. 291, 300-02 (2019) (discussing the order of succession for the Office of the Director of National Intelligence).

[16] *See Designating an Acting Director of National Intelligence*, 43 Op. O.L.C. 291 (2019); *Designating an Acting Director of the Federal Housing Finance Agency*, 43 Op. O.L.C. 70 (2019); *Designating an Acting Attorney General*, 42 Op. O.L.C. 182 (2018); *Designating an Acting Director of the Bureau of Consumer Financial Protection*, 41 Op. O.L.C. 99 (2017); *Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121 (2003); *Designation of Acting Solicitor of Labor*, 26 Op. O.L.C. 211 (2002).

above, it expressly rejected proposed statutory text that would have limited acting service to incumbent first assistants.

The Court also overlooked the significance of the backward-looking language in §3345(b)(1). Subsection (a)(1) sets out the general rule that when a PAS office is vacant, the first assistant shall perform the office's duties in an acting capacity. Subsection (b)(1) places limitations on acting service, delineating certain circumstances that prohibit a person from serving as the acting officer, "[n]otwithstanding" (a)(1)'s broad language. 5 U.S.C. §3345(b)(1). As discussed, §3345(b)(1) provides that a first assistant *who is the nominee* for the permanent position may serve as an acting officer only if she served as first assistant before the vacancy arose. Section 3345(b)(1) places no similar restrictions on a first assistant who serves as the acting officer and is *not* the nominee. The fact that subsection (b)(1) imposes prior-service restrictions *only* where the first assistant is also the nominee reinforces that (a)(1) does not contain such restrictions.

For the foregoing reasons, Mr. Sarcone was validly serving in this capacity when the indictment in this case was returned.

> **B.** **Mr. Sarcone was Authorized as Special Attorney and FAUSA to Conduct and Supervise Proceedings in the NDNY.**

As a result of the Attorney General's delegation of authority, Mr. Sarcone also was validly serving as FAUSA—both when the indictment was returned and later, when the Office rejected Dunlap's request for admission to the PATH program.  As discussed above, the Attorney General has separate, direct authority to conduct and supervise all litigation on behalf of the United States. *See* generally *In re Persico*, 522 F.2d 41, 54-55 (2d Cir. 1975). Further, the Attorney General may appoint various attorneys within the Department of Justice and has broad authority to delegate "any" of her functions to those attorneys. 28 U.S.C. §§510; *see also id*. §§515-19; *United States v.*

17

*Weyhrauch*, 544 F.3d 969, 974 (9th Cir. 2008) (per curiam) (recognizing delegation authority

under §515(a)). As the Second Circuit has summarized:

> [T]he Attorney General has authority to assign other officers of the Department of Justice, not only under 28 U.S.C. §515, but also under the other statutes giving [her] power over criminal litigation. If it were otherwise, [her] broad power to enforce the criminal laws of the United States would be seriously hampered at its inception—the initiation of a criminal case by presenting evidence before grand juries.

*Persico*, 522 F.2d at 55.

The FVRA does does not prohibit the exercise of lawfully delegated powers by non-acting officials—and it certainly does not prohibit an agency head from delegating her own powers independent of the vacant office. An "acting officer" is one who can perform all the functions and duties of the vacant office without qualification—*i.e.*, the person who can fully act as the absent officer. Indeed, that is why the person uses the title of the vacant office—*e.g.*, Acting U.S. Attorney—and why the title has significance. The FVRA is the exclusive means for temporarily authorizing service as an *acting* official. 5 U.S.C. §3347(a).

Delegation is different. A delegation of authority occurs when one officer empowers another official to perform a function vested in that officer. Delegations are limited by the scope of the delegation; they are not necessarily limited to times of vacancies; they do not confer titles; and they are valid only if the function is delegable. *See, e.g., United States v. Giordano*, 416 U.S. 505, 512-23 (1974). A delegation cannot include any functions vested exclusively in the vacant PAS office by statute or regulation, *i.e.*, non-delegable duties.[17]

---

[17] This Court expressly recognized the difference between service as a delegee and service as an acting official. In a separate matter, it held that Mr. Sarcone, in his capacity as FAUSA, could not be delegated the authority to seek disclosure of tax information pursuant to 26 U.S.C. §6103(i). *See In re Order to Authorize Disclosure of Tax Returns*, No. 25 Misc. 22 (LGS), 2026 WL 63331, at *3 (N.D.N.Y. Jan. 8, 2026). Mr. Sarcone was vulnerable to that challenge only because, in his capacity as FAUSA, he could exercise only delegable authority, whereas an Acting U.S. Attorney

So although the FVRA prohibits the use of general delegation authority to establish an acting officer who can exercise all delegable and non-delegable duties of an office, *see* 5 U.S.C. §3347(b), it does not restrict an agency head's authority to otherwise delegate her delegable duties. The Attorney General has the authority to supervise litigation in the NDNY, 28 U.S.C. §§509, 515-19, and that authority is delegable, 28 U.S.C. §§510, 515. Mr. Sarcone thus has the authority to supervise the office regardless of whether he holds the office of U.S. Attorney in an acting capacity.

The Attorney General's delegation of authority to Mr. Sarcone is consistent with well-established practice—endorsed by all three branches of government—recognizing that an agency head may delegate authority to perform certain functions and duties of a vacant PAS office, even where the individual would not be eligible to serve in an "acting" capacity under the FVRA.

The Executive Branch has long understood delegations of authority to allow the duties of an office to be performed during a vacancy when there is no acting official in place. Shortly after the FVRA was enacted, OLC determined that "the Act permits" certain "responsibilities to be delegated to other appropriate officers and employees in the agency" because "Congress understood that there would be occasions . . . when there would, for a period, be no one qualified to serve in an acting capacity." *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 72 (1999). Accordingly, executive officials routinely carry out the functions of a vacant PAS office pursuant to a delegation of authority where no acting official is available. *See, e.g.*, Anne Joseph O'Connell, *Actings*, 120 Colum. L. Rev. 613, 634 (2020) (noting that "many functions and duties are regularly delegated" to executive officials).

---

would be fully empowered to exercise all authority of a U.S. Attorney, both delegable and non-delegable.

19

Notably, Congress has endorsed the view that executive officials may exercise authority pursuant to delegations that are independent of, and compatible with, the FVRA. In enacting the FVRA, the Senate Committee on Governmental Affairs recognized that the "[d]elegable functions of the [vacant] office could still be performed by other officers or employees," even where no acting official was serving under the FVRA. S. Rep. No. 105-250, at 18. And GAO—again, the arm of Congress charged with monitoring FVRA compliance—agrees that non-acting officials can perform the lawfully delegated duties of a vacant office. *See* Letter from Gary L. Kepplinger, General Counsel, GAO, to U.S. Senators Richard J. Durbin, Russell D. Feingold, and Edward M. Kennedy (June 13, 2008) (concluding that the FVRA did not prohibit Steven Bradbury from performing the duties of the vacant office of Assistant Attorney General for OLC while serving as Principal Deputy Assistant Attorney General), *available at* https://www.gao.gov/assets/b-310780.pdf.

The Second Circuit and other Courts of Appeal have endorsed this view, concluding that the FVRA does not preclude a non-acting officer from exercising lawfully delegated duties of a vacant PAS office. *See Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132, 135 (2d Cir. 2009); *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1336 (Fed. Cir. 2022). Other Circuits have adopted similar logic in holding that the FVRA's remedial provisions do not prohibit ratification of an agency official's performance of lawfully delegated duties of a vacant office. *See Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1073-74 (9th Cir. 2024); *Kajmowicz v. Whitaker*, 42 F.4th 138, 148 (3d Cir. 2022).

Contrary to this Court's determination in *In re Grand Jury Subpoenas*, 814 F. Supp. 3d at 298, the breadth of the Attorney General's delegation of authority to Mr. Sarcone as a special attorney pursuant to 28 U.S.C. §515 and related statutes did not render the delegation invalid. In

20

*Arthrex*, the Federal Circuit held that the exclusivity clause of FVRA did not prohibit an officer's exercise of a delegable function pursuant to the *wholesale* delegation of the delegable functions of a vacant PAS office. 35 F.4th at 1335-38. Even the Third Circuit acknowledged that its *Giraud* opinion conflicted with *Arthrex*. *See Giraud*, 160 F.4th at 405 (expressly splitting with *Arthrex*).

Broad delegations are common and have not historically been challenged in litigation. Take, for example, the Deputy Attorney General's authority to exercise all the delegable functions of the Attorney General, *see* 28 C.F.R. §0.15, which encompasses not just all the delegable functions of every U.S. Attorney, but also all the delegable functions of the many other PAS officers in the Department of Justice, *see* 28 U.S.C. §§509, 510.

Likewise, 28 U.S.C. §515 is broadly worded, permitting the Attorney General to direct any special attorney to "conduct any kind of legal proceeding . . . including grand jury proceedings . . . which United States attorneys are authorized by law to conduct." 28 U.S.C. §515(a). Accordingly, for more than a century, courts have construed §515 and its precursor to confer broad authority upon the Attorney General, other DOJ officers, and her special attorney appointees "to institute litigation, to enter into pending litigation, and to co-operate with the district attorney or to proceed to handle such litigation independent of" the U.S. Attorney. *United States v. Hall*, 145 F.2d 781, 785 (9th Cir. 1944); *see United States v. Wrigley*, 520 F.2d 363, 367 n.10 (8th Cir. 1975) (§515(a) "is a broad grant of authority"); *United States v. Martins*, 288 F. 991, 992 (D. Mass. 1923); *cf. United States v. Birdman*, 602 F.2d 547, 561 n.62 (3d Cir. 1979) (citing *Wrigley*).

For example, one court upheld a §515(a) appointment "'to prosecute unspecified persons for unspecified crimes in the Eastern District of Wisconsin and other districts.'" *Infelice v. United States*, 528 F.2d 204, 206 (7th Cir. 1975). Another upheld an appointment to prosecute specified cases "and in such other cases and matters as may be assigned to you." *Martins*, 288 F. at 992.

21

And *Wrigley* upheld §515(a) appointments to conduct "any kind of legal proceedings, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States Attorneys are authorized to conduct." 520 F.2d at 364. The Eighth Circuit rejected the argument that such an appointment "would allow the Attorney General to usurp, through the appointment of special attorneys, the function of the United States Attorneys." *Id.* at 365, 367. All those cases faithfully applied §515's text, because "any" means everything the Attorney General authorized the appointee to do. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'").

Critically, because the FVRA applies across the entire Executive Branch, its meaning cannot turn on the result of its application to one specific office in one specific agency, as the district court correctly recognized in *United States v. Ramirez*, 807 F. Supp. 3d 1086, 1113-14 (C.D. Cal.), *reconsideration denied*, 812 F. Supp. 3d 1011 (C.D. Cal. 2025). To the extent that the primary functions of a Department of Justice lawyer—participating in litigation and supervising others—can be delegated to any Department lawyer, that is a feature of the Department of Justice that has little to do with the FVRA.

Accordingly, even if Mr. Sarcone's service as Acting U.S. Attorney was invalid, he was authorized to supervise the Office—including the presentation of indictments and determinations of eligibility for the PATH program—in his capacity as FAUSA. Several district courts have reached this same conclusion under similar circumstances. In *Ramirez*, for example, the district court concluded that even if the FVRA invalidated the service of the Acting U.S. Attorney Bilal A. Essayli, he "was properly appointed as a Special Attorney and designated as the FAUSA." 807 F. Supp. 3d at 1112. Accordingly, the court found it had "no basis to preclude" Mr. Essayli "from

22

performing the lawful duties of a FAUSA," which included supervising prosecutions. *Id.* The court recognized that this authority "stems from the power of the Attorney General to delegate [her] authority." *Id*. at 1114; *accord United States v. Ndissi*, No. 2:25-CR-00143-CR-1, 2026 WL 318836, at *4 (D. Vt. Feb. 5, 2026). Similarly, in *United States v. Ramirez-Martinez*, No. 1:22-CR-01721-KWR, 2026 WL 113431 (D.N.M. Jan. 14, 2026), the district court considered a similar delegation by the Attorney General to then-Assistant United States Attorney Ryan Ellison. As here, the Attorney General delegated to Mr. Ellison "all the delegable, nonexclusive functions of the United States Attorney for the District of New Mexico." *Id*. at *9. The Attorney General also designated Mr. Ellison as the FAUSA, as she did here. *Id*. Although the district court in *Ramirez-Martinez* determined that the §515 delegation could not authorize Mr. Ellison to perform all the functions of the United States Attorney, it nevertheless determined that this delegation authorized Mr. Ellison to perform the functions of a FAUSA, including supervising and conducting legal proceedings in that district. *Id*. at *19-20. As a result, the district court refused to invalidate actions taken by Mr. Ellison within the scope of those delegable functions and refused to disqualify him from performing the lawful duties of a FAUSA. *Id*. at *21-24; *see also United States v. Martinez,* No. 2:25-CR-692-MEMF, 2026 WL 1850083 (C.D. Cal. June 24, 2026) (denying motion to dismiss indictment on same grounds).  Even if the FVRA prohibited Mr. Sarcone from assuming the position of Acting U.S. Attorney, he had independent authority, delegated to him by the Attorney General, to supervise criminal prosecutions in the NDNY.

III.   **Dunlap's Indictment Should Not Be Dismissed Because It Was Lawfully Obtained by Duly Authorized AUSAs.**

Dunlap argues that his indictment should be dismissed because the "prosecution was approved and continued by a private citizen," referring to Mr. Sarcone, "who was not lawfully

23

appointed [to] any relevant position." Dkt. 38 at 11. As discussed above, that argument is wrong as a matter of law.

In any event, as Dunlap acknowledges, his indictment was signed not by Mr. Sarcone, but by an Assistant U.S. Attorney, whose authority Dunlap has not challenged. "Because [AUSAs] are appointed directly by the Attorney General, . . . their ability to act does not hinge on the authority of the local United States Attorney, but derives from the Attorney General's plenary power over litigation to which the United States is a party[.]" *United States v. Hilario*, 218 F.3d 19, 22 (1st Cir. 2000) (citing 28 U.S.C. §§516 & 542); *see also, e.g., United States v. Garcia*, No. 25-cr-227, 2025 WL 2784640, at *15-16 (D. Nev. Sept. 30), *appeal filed*, No 25-6468 (9th Cir. Oct. 14, 2025); *Ramirez*, 807 F. Supp. 3d at 1107; *Ndissi*, 2026 WL 318836, at *4, *5; *United States v. Baldwin*, 541 F. Supp. 2d 1184, 1196 (D.N.M. 2008); *United States v. Dillard*, No. 4:24cr47, 2026 WL 560356, at *4-5 (E.D. Va. Feb. 27, 2026). Thus, regardless of whether Mr. Sarcone's name is on the signature block of Dunlap's indictment, Dunlap's indictment is valid and should not be dismissed: it was signed by AUSA Commandeur for AUSA McCrobie, both of whom derived their prosecutorial authority directly from the Attorney General. *See, e.g., Garcia*, 2025 WL 2784640, at *16; *Ramirez*, 807 F. Supp. 3d at 1114; *Ramirez-Martinez*, 2026 WL 113431, at *21; *Ndissi*, 2026 WL 318836, at *4 & n.2 (collecting cases).

Pursuant to the Rules of Criminal Procedure, an indictment "must be signed by an attorney for the government[,]" Fed. R. Crim. P. 7(c)(1), which by definition includes an AUSA, Fed. R. Crim. P. 1(b)(1)(B), 1(b)(1)(D); *Ramirez-Martinez*, 2026 WL 113431, at *22 n.228. The purpose of the rule is to demonstrate that the prosecutor vouches for the indictment's authenticity and joins with the grand jury in instituting a criminal proceeding. *Kelley v. United States*, 989 F.3d 67, 68-70 (1st Cir. 2021). The signature of AUSA Commandeur for AUSA McCrobie is therefore more

24

than sufficient to satisfy the purpose of the rule and preclude dismissal of Dunlap's indictment. *See, e.g., Garcia*, 2025 WL 2784640, at *16; *Ramirez-Martinez*, 2026 WL 113431, at *22; *see also Ndissi*, 2026 WL 318836, at *5, *6 & n.4 (indictment at issue was valid because signed by AUSAs; court distinguished *United States v. Comey*, 2025 WL 3266932 (E.D. Va. Nov. 24, 2025) in which the indictment was dismissed because it was signed and presented to grand jury solely by interim U.S. Attorney whom the court concluded was invalidly appointed).

AUSA Commandeur's signature on the indictment establishes that Dunlap received the due process to which he is entitled. *Ndissi*, 2026 WL 318836, at *7. The roles of AUSA Commandeur and AUSA McCrobie in obtaining the indictment also establish that Dunlap's indictment is valid regardless of Mr. Sarcone's role in the Office. *See United States v. Giraud*, 795 F. Supp. 3d 560, 605–06 (D.N.J.), *aff'd*, 160 F.4th 390 (3d Cir. 2025) (concluding that an indictment was valid despite being signed by an individual the court concluded was unlawfully serving as Interim United States Attorney). The mere presence of Mr. Sarcone's name in the signature block does not change the legal analysis. *Cf. Dillard*, 2026 WL 560356, at *6; *Ramirez*, 807 F. Supp. 3d at 1109-10.

There is no basis for dismissal. As this Court has made clear, its previous ruling regarding Mr. Sarcone's appointment "imposes a narrow disqualification that applies only to the two investigations at issue [in that case], and rests on Mr. Sarcone's direct and personal involvement with subpoenas issued during ongoing pre-indictment investigations." *In re Grand Jury Subpoenas to the Office of N.Y. State Attorney General*, No. 25 Misc. 19 (LGS), 2026 WL 686046, at *3 (N.D.N.Y. Mar. 11, 2026). Moreover, as noted above, *supra* n.6, the government has appealed this Court's decision in *In re Grand Jury Subpoenas*, and its arguments supporting Mr. Sarcone's authority are not frivolous. *See, e.g.*, *Asylumworks v. Mayorkas*, No. 20-CV-3815 (BAH), 2023

WL 2733722, at *7 (D.D.C. Mar. 31, 2023) (rejecting claim of bad faith where government defendants sought review of district court ruling under FVRA).

Nor is there any other basis to dismiss the indictment. Dunlap claims in the alternative that his indictment should be dismissed "based on outrageous government conduct." Dkt. 38 at 11. Dunlap claims that Mr. Sarcone's exercise of his authority, even after this Court's order in *In re Grand Jury Subpoenas*, warrants dismissal.[18] But Dunlap misrepresents what constitutes "outrageous" conduct under this analysis. "[T]o obtain dismissal of an indictment based upon a claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous behavior *in connection with the alleged criminal events*[.]" *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) (emphasis added). Dunlap makes no showing that Mr. Sarcone or any other government actor engaged in outrageous conduct in connection with Dunlap's indictment for distributing substantial amounts of methamphetamine on three different occasions.

Otherwise, to prove that an indictment qualifies for dismissal, a defendant must typically establish that some kind of misconduct prejudiced him in the grand jury. *See, e.g., Bank of Nova Scotia v. United States*, 487 U.S. 250, 256-57 (1988); *Garcia*, 2025 WL 2784640, at *16 & n.10. Dunlap makes no such showing. He does not argue that the grand jury itself was improperly constituted, or that his due process rights were violated. He has not attempted to show that he was prejudiced by the appearance of Mr. Sarcone's name on the indictment. *Cf. Garcia*, 2025 WL 2784640, at *16 & n.10 (although individual was improperly serving as the acting U.S. Attorney, the presence of her name on the indictment's signature block did not require dismissal in the

---

[18] Dunlap's indictment was returned on July 24, 2025—more than five months *before* this Court's decision in *In re Grand Jury Subpoenas* on January 8, 2026.

absence of any demonstration of prejudicial misconduct because the indictment was properly signed by AUSAs). In short, Dunlap has not made out a viable case for dismissal of his indictment.

**IV.    There Is No Basis or Authority for the Court to Invalidate the Office's Decision to Deny Dunlap's Request to Participate in PATH.**

PATH participation is not a right. None of the descriptions or guidelines discussed or circulated in connection with PATH—other than signed plea agreements for PATH participants—bestow substantive or procedural rights on defendants desiring to participate in PATH, nor do they diminish the unfettered prosecutorial discretion of the U.S. Attorney's Office with respect to charging and plea decisions.

"Just as there can be no right without a remedy, so too there can be no remedy without a right." *United States v. Carroll*, No. 19 CR 545 (CM), 2020 WL 1862446, at *9 (S.D.N.Y. Apr. 14, 2020). The program imposes no limitations on the government's traditional prosecutorial discretion. *See United States v. Al Jibori*, 90 F.3d 22, 25 (2d Cir. 1996) ("[P]rosecutors retain broad discretion to enforce our criminal law[.]") (citation modified). Moreover, there is no evidence, and Dunlap does not argue, that the decision to deny Dunlap PATH participation was due to "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).

Dunlap is correct that Mr. Sarcone was not the U.S. Attorney at the time that Dunlap requested reconsideration of PATH denial. The NDNY currently has no U.S. Attorney and did not at that time. But under the PATH program, a defendant's request to participate is reviewed by multiple individuals in the U.S. Attorney's Office, including those in leadership positions of Team Leader, Criminal Chief, FAUSA, and U.S. Attorney. Dkt. 38-1.

Under Dunlap's theory that only a "U.S. Attorney" can determine whether to admit a defendant into the PATH program, no defendant can now be admitted *or* denied PATH

participation, regardless of Mr. Sarcone's involvement in the decision. Dunlap admits as much: "[o]nce [Mr. Sarcone's PATH review is] voided, there is no one in the United States Attorney's Office with the established authority to review Mr. Dunlap's PATH Application." Dkt. 38 at 12. But the PATH description document that Dunlap relies upon does not bear the weight that he places on it. It is not written as, nor was it intended to be, a binding and inflexible policy and procedures document. For example, it also states that the PATH Coordinator for the Probation Office (USPO) is Janna Kulakowski, dkt. 38-1 at 2, and that the USPO PATH Coordinator has a role in the PATH acceptance process, *id.* at 3. Ms. Kulakowski retired from the USPO in May 2025. For PATH to continue to operate to the benefit of defendants in this district, there must necessarily be flexibility in the PATH admission process with the inevitable changes to both individuals and roles in the USPO and USAO. Just as Dunlap did not complain of Mr. Sarcone's involvement in PATH admission when he applied, so too did he not challenge the legitimacy of the involvement of the new USPO decisionmakers.

That explains why Dunlap cannot articulate any relief to which he is entitled should the Court grant his wish to "void[] Mr. Sarcone's . . . denial of Mr. Dunlap's consideration for pretrial diversion." Dkt. 38 at 14. He instead asks in vague terms that the Court impose on the Office "some alternative review process" to evaluate Dunlap's request for PATH. *Id.* Dunlap fails to identify the Court's authority to do such a thing or provide any details on what that process would be.

## V.    Dunlap Is Not Entitled to Discovery on His Claims

As alternative relief, Dunlap requests discovery as to Mr. Sarcone's involvement in the Office's charging and PATH decisions as to Dunlap. But he fails to cite any authorities supporting his request, and despite claiming that such discovery "is necessary," he also fails to identify what contested material facts he hopes to develop. "Vague allegations, bald assertions of impropriety, or speculation about what the grand jury materials may reveal are insufficient to establish a

28

particularized need for disclosure." *Giraud*, 795 F. Supp. 3d at 606 (quotation and citation omitted). The district court in *Giraud* denied the defendant's request for discovery, which was based on "speculati[on] that Ms. Habba [the challenged Interim U.S. Attorney] may have played a role in influencing the charges that were included in this indictment." *Id.* And Giraud's insufficient speculation at least cited *some* (albeit insufficient) facts, including that Ms. Habba made a general public statement mentioning a New Jersey town, an official of which the defendant was accused of bribing. *Id.* In that case too—unlike here—Ms. Habba had actually signed the indictment. Dunlap cites *no facts* to support his speculation that Mr. Sarcone had a role in the prosecution and indictment of Dunlap. In denying the request for discovery, the *Giraud* court also observed that the defendant did "not account for the fact that Ms. Habba may have validly influenced the preparation of his indictment before [the date] when her appointment became unlawful." *Id.* The same is true here.[19]

"Because law enforcement is a core executive constitutional function, judicial intrusion into prosecutorial decisions is justified only when the Constitution requires it." *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996) (citation modified). In an analogous context of defendants seeking discovery in support of claims of vindictive or selective prosecutions, the Second Circuit has held that it is a "rigorous" standard in which the defendant "must provide some evidence tending to show the existence of the essential elements of the [claim]." *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (citation modified). That is because "examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the

---

[19] To the extent that the Court determines that it requires additional facts regarding the individuals involved in the approval and presentment of Dunlap's indictment to render its decision, the government will provide such materials for the Court's *in camera* review upon request. *See Giraud*, 795 F. Supp. 3d at 605 and n.292 (determining that an *in camera* review "is appropriate given the secrecy requirements that attend grand jury proceedings").

prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* (citation modified).

Dunlap acknowledges that Mr. Sarcone did not sign the indictment. And Mr. Sarcone's role in the PATH decision is neither contested nor relevant. As discussed *supra*, there is no constitutional or statutory right to PATH participation and Dunlap fails to assert any claims, let alone facts to support them, that the decisions related to his prosecution or PATH participation were motivated by improper considerations, such as race or religion, in violation of his constitutional rights.

## CONCLUSION

Dunlap's requests to dismiss the indictment, obtain discovery, or for the government to review Dunlap's PATH request yet again should be denied.

Dated: July 10, 2026                                    Respectfully submitted,

                                                        */s/ Matthew J. McCrobie*
                                                        Matthew J. McCrobie
                                                        Assistant United States Attorney
                                                        Bar Roll No. 702739